IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-06-89-5 |
| | § | CIVIL ACTION NO. H-10-1392 |
| ERIC VASQUEZ, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Eric Vasquez's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 497),[1] and Memorandum in Support (Document No. 498), the United States' Response and Motion to Dismiss (Document No. 521, 522),[2] and Movant's Reply to the Government's Response (Document No. 527). After reviewing Movant's § 2255 Motion, Memorandum in Support, the Government's Response and Motion to Dismiss, Movant's Reply to the Government's Response, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss (Document No. 522) be GRANTED, and that Movant Eric Vasquez's  § 2255 Motion (Document No. 497) be DENIED.

---

[1] Eric Vasquez's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-10-1392 and at Document No. 497 in Criminal Action No. H-06-89.  References hereafter will be to the Criminal Document numbers unless otherwise indicated.

[2] The Government moves to expand the record to include the Affidavit of John Friesell. The Government's request to expand the record is well-taken and the record is expanded to include the Affidavit of John Friesell.

I.      **Procedural History**

Movant Eric Vasquez ("Vasquez"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255.  This is Vasquez's first attempt at § 2255 relief.

On March 21, 2006, Vasquez, along with Juan A.  Escobar, Leon Baldomero DeLeon, Sugentino Percel, Jesus Alejandro Osorio, Leonardo Arcemio Garcia, Bonifacio Hernandez, and German Arias, was charged by Indictment with drug trafficking activities.  In particular, Vasquez was charged with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A)(ii) (Count one), and possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(ii), and 18 U.S.C. § 2 (Count two).  (Document No.  22).  Following a four-day trial, Vasquez was found guilty on both counts on November 20, 2006.  (Document No.  191).

Prior to sentencing, a pre-sentence investigation report ("PSR")  was prepared to which Vasquez filed written objections.[3]  (Document Nos.  261, 263, 278).  With respect to the Offense Conduct, and in particular, Vasquez's role in the offense, the PSR states in pertinent part:

> 5. On February 21, 2006, at approximately 10:00 a.m. information was received by officers of the Pasadena Police Department that a known narcotics trafficker was to meet with another subject at Bravo's Mexican Restaurant, 10906 Fuqua, Houston, Texas.

---

[3] At trial, Vasquez was represented by attorney John Riley Friesell.  Following his trial, attorney Steven Rozan replaced Mr.  Friesell.  (Document No.  210).  He was the attorney of record for purposes of Vasquez's sentencing.  Vasquez objected to PSR ¶ 22 and 23, which had no impact on the calculation of his guideline sentence.  He also objected to PSR ¶ 53 and 78. According to Vasquez, because he qualified for a safety valve provision he should have been given a two level offense reduction under U.S.S.G. § 5C1.2, which would have resulted in an adjusted offense level of 32, and with a Criminal History of I, an advisory Guideline range of 121-151 months.

6.  At approximately 10:45 a.m., surveillance was established in the parking lot of Bravo's Mexican Restaurant by members of the Pasadena Narcotics Unit along with DEA agents.

7.  At approximately 11:05 a.m., a gray Jeep Cherokee, Texas License #F36-DBH, was seen arriving and backed into a parking space with the rear of the vehicle facing towards Bingle.  The vehicle was occupied by a Hispanic male driver, (later identified as Bonifacio Hernandez), a Hispanic female passenger, and a young Hispanic male passenger in the back seat (approximately 4-6 years old).  The vehicle and its occupants stayed in the parking lot as if waiting for someone else to arrive.

8.  At approximately 11:11 a.m., a black GMC Yukon Denali, TXLP# 7GK-M52 was seen arriving and also backed into a parking space with the rear of the vehicle facing towards Bingle.  The GMC parked three spaces away from the gray Jeep Cherokee.  The GMC was occupied by two Hispanic males, (later identified as Juan Escobar (driver) and Leon Baldomero DeLeon).

9.  As Escobar and DeLeon exited their vehicle, Hernandez exited his vehicle as well.  All three males met in the center of the parking lot and walked to the entrance of the restaurant and went inside.

10.  A check of the two vehicles registrations by agents revealed that the Jeep was a 1999 Jeep registered to a Sergio Guadiana at 4022 Courtney, Houston, Texas.  The GMC was registered as a 2002 GMC Yukon to a Maria G.  Lucio at 7622 Lemma Dr., Houston, Texas.

11.  At 11:38 a.m., all three of the males emerged from the restaurant and got into their respective vehicles and left the area.  The Jeep went west bound on Bingle and then south bound onto the feeder of SH 290.

12.  The black GMC left in the same direction, but went north bound on the feeder of SH 290 and then entered the main lanes of SH 290.  Surveillance was maintained on the black GMC and it was followed to a residence located at 7430 Weatherhill, Houston, Texas.  The GMC parked in the home's driveway next to a green Ford Explorer, Texas license #X30-MFM.

13.  At approximately 1:25 p.m., two Hispanic females exited the home and got into the black GMC Denali and left the area.

14.  At approximately 4:38 p.m., DeLeon was seen emerging from the home carrying a large black duffel bag.  Agents observed him approach the green Ford Explorer that was still parked in the driveway and placed the bag in the left rear

3

passenger area of the vehicle.  He then shut the door to the vehicle and got a rake that was leaning against the home and began raking the front yard.  At approximately 4:52 p.m., Escobar was seen emerging from the home's front door. He was seen carrying two large black plastic trash bags that he cradled under his right arm and held at the top with his left hand.  As he was seen carrying the bags toward the Ford Explorer, DeLeon went to the Explorer to assist Escobar with the door to the Explorer so he could put the bags into the Explorer.  DeLeon then shut the door and continued raking leaves in the yard and Escobar was seen going back into the home.

15.  At approximately 4:53 p.m., Escobar returned to the front yard and walked to a white 4 door Honda Civic (paper plates) that was parked in the street in front of the home.  DeLeon followed him to the vehicle and they appeared to be looking in the engine compartment area of the vehicle.  As they were doing this, Escobar was seen using a cellular phone and appeared pre-occupied with the phone call.  At approximately 4:55 p.m., a Hispanic male, (later identified as Leonardo Arcemio Garcia) emerged from the home's front door.  He walked to the roadway and met with Escobar and DeLeon at the white Honda.  As Escobar spoke to Garcia, it appeared that Escobar handed Garcia a black cellular telephone.  The three talked briefly.  Garcia went back into the house while Escobar and DeLeon entered the Explorer.  The Explorer left the residence at approximately 4:58 p.m.

16.  Surveillance was maintained on the Explorer as it traveled to 8915 Alejo, Houston, Texas.  The vehicle arrived at 8915 Alejo at approximately 5:25 p.m.

17.  At approximately 5:43 p.m., Escobar and DeLeon were seen exiting 8915 Alejo, Houston, Texas.  Escobar opened the right rear passenger door of the Explorer and retrieved the two large black plastic bags from the passenger area. DeLeon retrieved the large black duffel bag.  They went directly to the front door of the home and went inside.

18.  At approximately 6:37 p.m., Escobar was seen exiting the home and got into the Explorer.  Surveillance was maintained on the Explorer and it was followed to Bravos Mexican Restaurant.  Upon arrival, the gray Jeep that Hernandez was driving was already in the parking lot.  The Explorer parked next to the Jeep and the occupants spoke.

19.  At approximately 6:51 p.m., Hernandez, and two other Hispanic males (later identified as German Arias and Sugentino Percel) got into the Explorer with Escobar and they departed the restaurant parking lot.

20.  At approximately 7:03 p.m., surveillance followed the Explorer back to 8915 Alejo, Houston, Texas.

21.  Upon arriving back at 8915 Alejo, DEA Agents observed all three occupants exit the Explorer and go inside the home.  Agents advised that Arias and Percel were carrying medium sized black plastic bags (one each), as they entered the home.

22.  At approximately 8:36 p.m., Escobar again left the home located at 8915 Alejo, Houston, Texas and drove to an apartment complex located at 3737 Watonga.  Upon arrival at the apartment complex, Escobar did not enter the property.  He arrived and stopped in the 3700 block of Watonga where he was met by two Hispanic males that were waiting for him near the roadway.  The two males he picked up were later identified as Jesus Osorio and **Eric Vasquez**.  All three subjects left the area in the Explorer and traveled back to 8915 Alejo, Houston, Texas.  They arrived at approximately 9:15 p.m. and all three exited the Explorer and entered the home.

23.  At approximately 9:30 p.m., Escobar, Osorio, and Arias, left the home at 8915 Alejo and drove back to 3737 Watonga.  This time the Explorer entered the complex and drove to the northwest portion of the parking lot.  Surveillance was maintained on the vehicle and its three occupants.  Osorio and **Vasquez** exited the Explorer and got into a silver Dodge mini-van, Illinois License #D264919.  They started the vehicle and followed the Explorer that Escobar was driving.  Surveillance was maintained on both vehicles as they traveled in tandem back to 8915 Alejo, Houston, Texas.

24.  At approximately 9:57 p.m., the Explorer arrived back at 8915 Alejo, Houston, Texas, and this time Escobar did not park it in the driveway.  He parked the Explorer in the street in front of the home.  As he was parking the Explorer, the Dodge mini-van arrived and pulled into the driveway.  Someone from inside the home opened the garage door as the mini-van was pulling up to it.  The mini-van was seen pulling into the single car garage and the door was shut.  As the door was being shut, the lights inside the garage were turned off.  As the door shut, Escobar was seen backing the Explorer into the driveway all the way to the garage door, nearly touching it.  Escobar then got out of the Explorer and went into the house by way of the front door.

25.  At approximately 11:05 p.m., Escobar exited the home and got into the Explorer and pulled out of the driveway and waited in the roadway. As he was doing so, the garage door opened and the Dodge mini-van backed out of the garage, down the driveway, and pulled behind the Explorer.  The two vehicles left the residence in tandem.

26.  At approximately 11:15 p.m., a Harris County Sheriff's Office Deputy stopped the mini-van for a traffic violation for an expired vehicle registration.

5

Upon contacting the two occupants of the vehicle, (identified as German Arias (Driver) and Jesus Osorio) the deputy obtained verbal consent to search the mini-van using his narcotics detecting K-9.  The deputy advised agents his K-9 gave a positive alert on the right rear exterior of the vehicle.  The deputy then conducted a search of the vehicle and was able to locate approximately 10 heat sealed clear plastic packages wrapped in green cellophane in the right rear quarter panel of the mini-van.

27.  Upon opening one of the ten packages found, it contained a compressed white powdery substance that tested positive for cocaine content using a Scott reagent test kit.  The packages were sealed in clear heat sealed plastic.  Inside the clear plastic was green cellophane that had been tightly wrapped around the contents.  Under several layers of the green cellophane, there was a layer of axle grease, more cellophane and then the white compressed substance.

28.  Laboratory analysis revealed the total approximate net weight of the cocaine seized from the mini-van as **9.9 kilograms.**

29.  Osorio and Arias were kept separate from one another.  Osorio was then transported to the area of 3737 Watonga #16, Houston, Texas, where agents obtained a written consent to search Osorio's residence.

30.  A search of Osorio's residence, produced a small amount of marijuana in the kitchen cabinet along with a small digital scale containing white residue.  The residue was field tested and showed positive for the presence of cocaine.  Osorio stated the marijuana found was for personal use but would not reveal where he obtained it.

31.  As the traffic stop on the Dodge mini-van was being initiated, surveillance advised that the Explorer being driven by Escobar drove past the traffic stop and u-turned.  The vehicle was followed as it made its way back to the area of 8915 Alejo, Houston, Texas.  The vehicle turned onto Alejo and instead of turning left to go to the house, it turned right and waited in the middle of the street approximately 55-65 yards away from the home.  Hernandez was seen briskly walking down the driveway of 8915 Alejo towards the waiting Explorer.  As Hernandez proceeded toward the Explorer, he was closely followed by **Vasquez**, Percel, and DeLeon.  Once all were in the vehicle, it sped away at a high rate of speed.  The Explorer eventually drove to the area of 3737 Watonga #16, Houston, Texas, where it was stopped by marked Houston Police Department (HPD) units.  HPD officers arrested Escobar, Hernandez, DeLeon, Percel and **Vasquez** without incident.

32.  Agents were conducting a federal search warrant at the home of Juan Antonio

Escobar (with written consent by Escobar's wife, Izabela Danuto Jurczenko), 7430 Weatherhill, Houston, Texas, when surveillance advised them of the cocaine discovery in the mini-van.  A search of Escobar's home, where Leonardo Arcemio Garcia was found to be present, revealed eight (8) more kilogram sized bricks of cocaine, MDMA, cocaine base, $52,475 in U.S. currency, a Cabilondo y Ciavitoria .45 Caliber pistol, a Ruger 9mm pistol, a suspected drug ledger, various scales, cellophane, baggies and marijuana at the residence.  Agents discovered a 1997 white Dodge pickup truck in the garage with a hidden compartment built between the backseat and bed of the truck.  The eight kilograms of cocaine were located in the master bedroom closet and the two pistols were located in the master bedroom dressers.

33.  Laboratory analysis revealed the total approximate net weight of the illegal substances seized from Escobar's home as follows: **7.8 kilograms of cocaine**, 13.6 grams of cocaine base, 7.7 grams of 3, 4 Methylenedioxymethamphetamine (MDMA) and 7.5 grams of marijuana.

34.  During the search of Escobar's home, agents learned that Escobar's wife, Izabela Danuto Jurczenko, owned the home located at 8915 Alejo, Houston, Texas.  She advised agents that nobody was presently living there and was willing to give written consent to search that home as well.

35.  On February 22, 2006, at approximately 3:08 a.m., Mrs.  Jurczenko arrived at 8915 Alejo, Houston, Texas, and did give written consent to search the home.  The front door was found to be standing ajar.  Inside the home in a small bedroom located in the central portion of the home, agents discovered two black plastic trash bags that contained a total of twenty five (25) additional kilogram sized bricks of cocaine.  The bricks were packaged identically to those located in the mini-van.  Upon opening one of them, agents found that the packages contained a compressed white powdery substance which tested positive for cocaine content using a Scott reagent test kit.  There were ten (10) bricks located in one bag and fifteen (15) brick located in the other.  Inside the kitchen area of the home, agents found a vacuum seal machine and latex gloves that had been worn and had axle grease all over them.  There were also unused latex gloves, green cellophane and paper towels with smeared grease all over them.  In the living room area, agents located a large black duffel bag Deleon had previously been seen carrying to the Explorer and then into the home.  Inside the bag, agents located a large electronic money counter.

36.  Laboratory analysis revealed the total approximate net weight of the cocaine seized from 8915 Alejo, Houston, Texas, as **24.9 kilograms**.

7

Relevant Conduct Assessment

37.  **Eric Vasquez** is held accountable for the sale and negotiation of a total of 34.8 kilograms of cocaine from Hernandez and Osorio.  The total of 34.8 kilograms of cocaine is derived from the 9.9 kilograms of cocaine seized in the minivan driven by Osorio and Arias and the 24.9 kilograms of cocaine seized from the 8915 Alejo, Houston, Texas.  **Vasquez** is seen to have neither an aggravating or mitigating role in the drug conspiracy.  (emphasis in original)

Pursuant to the PSR, Vasquez's advisory guideline sentencing range was calculated as follows:

(1) Vasquez had a base offense level of 34 under U.S.S.G. § 2D1.1(c)(3).[4]  (2).  With a total offense level of 34, and with a criminal history category of I, Vasquez had an advisory guideline sentence range 151 to 188 months. On March 16, Vasquez was sentenced to a term of imprisonment of 151 months, a 5 year term of supervised release, a $200 special assessment, and a fine of $17,500.  (Document No.  281, Transcript of Sentencing Hearing, Document No.  397, pp.11-13 ).  Judgment was entered on March 28, 2007.  (Document No.  300).  With respect to Vasquez's sentence, Judge Harmon stated:

> Now, Mr.  Vasquez.  Mr.  Vasquez is before the Court having been found guilty by jury trial to one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine and one count of possession with intent to distribute five kilograms or more of cocaine.  He is viewed as an average participant within this drug trafficking organization which was operating in Texas.  He's a 38-year old United States citizen who is married with three children and lives in Boston, Massachusetts.  He has no ties to the Houston area.  And this is also his first federal conviction.  He has no prior criminal history, although he was charged with a drug trafficking crime in 2004, which was dismissed by the state court in Massachusetts.
>
> I believe that a sentence at the low end of the advisory guideline range will take

---

[4] According to ¶ 40 of the PSR, Vasquez was interviewed by a Probation Officer but maintained his innocence.  The PSR states: "[o]n December 19, 2006, Vasquez was interviewed for this report while incarcerated at the Federal Detention Center (FDC) at Houston, Texas, in the presence of his attorney.  Although found guilty by jury trial, Vasquez maintains his innocence and declined to provide any further statement regarding his involvement in the instant offense."

into consideration the seriousness of his offense as well as the need to protect the public from further crimes of the defendant pursuant to 18 United States Code, Section 3553(a).

I have taken into consideration 18, United States Code, Section 3553(a) and the guidelines and believe that a sentence within the guidelines is appropriate and will satisfy the requirements of 18, United States Code, Section 3553(a).  (Document No.  397, p.  10-11).

Vasquez along with his co-defendant Percel appealed their convictions to the Fifth Circuit Court of Appeals.  (Document No.  285).  On appeal, Vasquez argued (1) that the district court committed reversible plain error in its oral jury instruction when it omitted the word "not" in stating that "no inference whatever may be drawn from the election of a defendant to testify" and (2) that there was insufficient evidence to support his conviction on both counts.  The Fifth Circuit, unpersuaded by all the arguments raised by Vasquez, on December 23, 2008, affirmed the conviction.  (Document No.  425).  With respect to Vasquez and Percel's challenge to the jury instruction, the Fifth Circuit wrote:

When instructing the jury at the close of evidence, the judge stated, "The law does not require a defendant to prove his or her innocence or produce any evidence at all and no inference whatever may be drawn from the election of a defendant to testify."  The instruction to which the parties agreed stated that "no inference whatever may be drawn from the election of a defendant *not* to testify."  Neither side raised any objections to the erroneous instruction when given, and the written instructions sent to the jury room contained the proper language.

The first issue Percel and Vasquez raise on appeal is whether the district court committed reversible plain error in its oral jury instructions when it omitted the word "not" in stating that "no inference whatever may be drawn from the election of a defendant to testify."  Generally, incorrect jury instructions are not considered structural errors, and because neither Percel nor Vasquez objected to the jury instruction in the district court, we review the instruction for plain error.  A jury instruction is plain error if "(1) it was erroneous; (2) the error was plain; and (3) the plain error affected the substantial rights of the defendant."  This court has discretion to correct plain error where "the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  The proper inquiry on

9

plain error review "is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it.

Percel, who testified at trial, appears to argue that by instructing the jury that "no inference whatever may be drawn from the election of a defendant to testify," the district court prevented the jury from making any inferences based on the content of his testimony. However, it is unlikely that the jury would have interpreted the instruction in such a way. At most, the instruction prevents the jury from drawing any inferences from Percel's *election to testify*, not from the substance of the testimony itself. Even if the instruction were interpreted as Percel contends, the judge later instructed the jury that it was permitted to draw reasonable inferences from the testimony of witnesses and that the defendant's testimony should be weighed just like any other witness. Thus, the district court's jury instruction was not plain error as to Percel.

Vasquez, who did not testify, argues that the instruction violated his Fifth Amendment right against self-incrimination because it allowed the jury to draw an inference of guilt from his failure to testify. A criminal defendant has a Fifth Amendment right for a judge, upon the defendant's request, to instruct a jury not to make any adverse inferences based on the defendant's election not to testify. Vasquez requested a "no-adverse-influence" instruction and the court agreed to give it. However, because the judge omitted the word "not" in [her] oral instructions, the instruction was error.

However, the judge's error was not plain error because the omission of the word "not" in the jury instruction, when viewed in light of the entire trial, did not seriously affect the trial's fairness or integrity. The effects of the judge's omission in his oral instructions were mitigated by the fact that the written instruction sent into the jury room contained the correct wording.

Moreover, at the beginning of the trial, during voir dire, the judge correctly instructed the potential jurors that the burden was on the Government to present the evidence in the case and "if [the defendants] don't testify or put on any evidence, you cannot hold that against them as some indication of evidence. You can't require them or expect them to explain themselves or put on any evidence." The judge further explained that "there are reasons why in a criminal trial, which is completely different from any other situation in the whole world, ... a person might not want to get up on the stand and explain themselves or tell you his side of the story. The law requires that you, as a juror ... to say, [']Okay, that's fine, I'm not going to hold that against him.[']"

Given that the jury was properly instructed during voir dire and had access to the

10

correct instruction during its deliberation, there is not a reasonable likelihood that the jury would have applied the judge's erroneous oral instruction unconstitutionally.  The omission does not constitute plain error.  (Document No. 425, p.  5-8) (emphasis in original) (footnotes omitted).

In addition to rejecting Vasquez's jury instruction claim, the Fifth Circuit found there was sufficient evidence to support his conviction on both counts.  The Fifth Circuit wrote:

Vasquez argues that there was insufficient evidence to support his conviction on both counts.  Because he preserved his insufficiency-of-evidence claim by moving for a judgment of acquittal at the close of the Government's case-in-chief and at the close of all evidence, we review his claim de novo.  We will affirm the district court "if a reasonable trier of fact could conclude [that] the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict."

Count One charged Vasquez with conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846.  The elements of that offense are (1) an agreement with one other person to possess with intent to distribute at least five kilograms of cocaine; (2) defendant's knowledge of the agreement; and (3) defendant's voluntary participation in the conspiracy.  Absent direct evidence of an agreement, the jury can infer the existence of an agreement from circumstantial evidence.

Vasquez argues that the evidence was insufficient to show that he agreed to, knew about, or participated in the possession with intent to distribute cocaine.  He argues that the Government was only able to prove that Vasquez was present at the house, not that he participated in the drug-related activities.  Vasquez contends that the only evidence showing that he knew of and participated in the drug-related activities came from two cooperating witnesses who testified subject to the terms of a plea agreement and thus were not credible witnesses.

The evidence presented to the jury was more than sufficient to support Vasquez's conviction on Count One.  Though mere presence at a crime scene is insufficient to support an inference of participation in a conspiracy, "the jury may consider presence and association, along with other evidence, in finding conspiratorial activity by the defendant."  The evidence clearly placed Vasquez at the location of the drug activities.  DeLeon and Arias testified that Vasquez and Percel had arranged to purchase the drugs and took part in the packing and stashing of the drugs in the minivan.

11

That DeLeon and Arias testified pursuant to a plea agreement does not change the fact that this evidence was sufficient for the jury to convict.  The jury knew that DeLeon and Arias were cooperating witnesses expecting sentence reductions in return for their testimony, and the judge properly instructed the jury that "such testimony is always to be received with caution and weighed with great care." The jury was fully capable of weighing the credibility of these witnesses.

Count Two charged Vasquez with aiding and abetting the knowing and intentional possession with intent to distribute of five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii), and 18 U.S.C. § 2.  To prove aiding and abetting, the Government must show that (1) the offense of possession with intent to distribute occurred and (2) Vasquez associated himself with the venture, participated in it as in something he wished to bring about, and sought by this action to make it succeed.  For the association element, "the defendant must have 'shared in the criminal intent of the principal[s].'" The underlying offense of possession with intent to distribute requires the Government to prove that the defendant "(1) knowingly (2) possessed cocaine (3) with intent to distribute it."

Vasquez admits that there was sufficient evidence to show that the offense of possession with intent to distribute occurred.  However, he argues that there was no evidence that he was directly involved in the offense, other than the unreliable testimony of DeLeon and Arias.  As discussed previously, the testimony of DeLeon and Arias was properly considered by the jury and was sufficient for a jury to convict Vasquez on Count two.  (Document No.  425, pp.  8-11) (footnotes omitted).

Vasquez filed a petition for writ of certiorari with the United States Supreme Court, which was denied on April 27, 2009.  *Vasquez v.  United States*, 129 S.Ct.  2065 (2009) (Document No. 441).  As such, Vasquez's judgment and conviction became final on April 27, 2009.

The docket sheet reveals that on October 14, 2009, Vasquez filed Motion for New Trial Pursuant to Fed. R. Crim. P. 33 (Document No.  459), in which he argued that he had newly discovered evidence namely, a sworn statement from Bonifacio Hernandez, in which Hernandez stated that Vasquez did not participate in the conspiracy.  Judge Harmon denied the Motion. (Document No.  470).  Vasquez appealed the denial to the Fifth Circuit Court of Appeals.

(Document No. 473).  The Fifth Circuit affirmed the denial on July 15, 2010.  The Fifth Circuit

wrote:

> Vasquez based his motion for a new trial upon newly discovered evidence in the form of a sworn statement from a nontestifying codefendant, Bonifacio Hernandez, to the effect that Vasquez did not participate in the conspiracy to possess with the intent to distribute cocaine and in fact had no knowledge of the cocaine.  A defendant moving for a new trial must show that: (1) the evidence is newly discovered and was unknown to him at the time of trial; (2) the defendant's failure to discover the evidence was not due to a lack of diligence; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence would probably produce acquittal at a new trial.  *United States v. Freeman*, 77 F.3d 812, 817 (5th Cir. 1996).
>
> First, because defense counsel was aware of Hernandez's proposed testimony prior to trial, the evidence was not newly discovered.  *See United States v. Desir*, 273 F.3d 39, 44 (5th Cir. 2001).  Second, there is no indication in the record that Vasquez exercised diligence in obtaining Hernandez's statement.  Third, Hernandez's proffered testimony would not probably result in an acquittal.  Accordingly, the district court did not abuse its discretion in denying the motion for a new trial.  *See Freeman*, 77 F.3d at 817.  (Document No. 517).

On April 26, 2010, within one year of his conviction being final, Vasquez timely filed a § 2255

Motion to Vacate, Set Aside, or Correct Sentence (Document No. 497) and a Memorandum in

Support (Document No. 498).  In his § 2255 Motion, Vasquez raises claims of ineffective

assistance of counsel.  According to Vasquez, his trial counsel was constitutionally ineffective

for failing to interview co-defendants who would establish that they were coerced to testify for

the government.  Vasquez further alleges that counsel was ineffective for failing to advise him as

to the effect of the Guidelines and how they would be used to calculate his sentence "thus

rendering his plea involuntary."  Next, Vasquez alleges that counsel was ineffective for failing to

advise him that the Guidelines (§§ 2D1.1(b)(6) and 5C1.2) would have "allow[ed] him to have

his sentence reduced by 2 levels and avoid the minimum mandatory sentence required by

statute." Vasquez also alleges that counsel was constitutionally infective for failing to object to

the "improper jury instructions that allowed the jury to draw an inference on his fifth amendment

silence during the jury instruction." Finally, Vasquez claims that the cumulative impact of trial

counsel's errors require him to be re-sentenced and/or an evidentiary hearing. In support of this

ineffective assistance of counsel claims, Vasquez has submitted several affidavits. An affidavit

from co-defendant German Arias states in pertinent part:

> On February 21, 2006, I was arrested in Houston, Texas, where I believe that the
> Agents violated my rights when stopped [sic] the rented vehicle. I was driving the
> vehicle and they used the excuse that (sic) was missing the sticker in my license
> plate, however, they never gave me a ticket and took the vehicle. Without me
> giving them permission they started looking inside the vehicle and they did not
> bring an interpreter. I do [not] speak [E]nglish. After two or three times looking
> inside the car, they found 10 kilos of cocaine. Eventually, I spoke with an
> attorney named IZGUIRRE who told me that they wanted me to plead guilty and
> cooperate with the government so I would get less time in jail not be deport [sic]
> to my country.

> I signed the agreement to plead me guilty and met the prosecutor, the agents and
> my lawyer. They asked me to testify against Eric Vasquez and Sugentino Percel
> in their case if they do not accept guiltiness. I told my lawyer that I could not
> testify against these people because they were not involved in this crime that I
> committed.

> Then they told me that I had signed the agreement already and if I refused to
> testify against these people, they could send me 15 to 20 years in jail, perjury
> charges and deport me to my country.

> I want to clarify that both Sugentino Percel and [Eric] Vasquez are not involved in
> this crime, when they were arrested in Houston Texas on February 21, 2006, and
> they did not help me wrap the kilos of cocaine at any time nor helped me place
> them in the car. They had no knowledge of what I was doing because I was most
> of the time in the bedroom of the house located in Alejo Street where they found
> 25 kilos of cocaine while Vazquez and Percel were in the living room watching
> television, playing dominoes and drinking beer.

> Because of the pressure I felt on the part of the lawyer, the prosecutor and the
> agents, I had a nervous breakdown. The doctor went to visit me and gave me

some medications.  My lawyer, the prosecutor, and the agents knew about this all the time, but after the meetings with the prosecutor and the agents my nervous breakdown was even stronger so I took more pills that the doctor gave me for the day.  When I went to testify at trial, I kept those pills for me for those moments of depression and was drinking pills during the testimony.

I agreed to sign the agreement with the government, but not all was completely clear for me, if I had known I had to testify against Vasquez and Percel I would never have done this.  I told this to my lawyer in advance but he fooled me.

I also want to clarify that I testified at the trial that Vasquez and Percel were making a transaction of 15 kilos of cocaine in November or December 2005 and January 2006 but that never happened.  That was not true.  What actually occurred was that in one of the meetings with the government they were pushing me too much for me to say when I had made another drug transaction and I told them that in November 2005 Percel, Vasquez and me made a transaction of 15 kilos of cocaine, but that was not true.  Then before I took the stand to testify, the prosecutor sent a message to my lawyer and asking me to say in the court that the transaction of the 15 kilos was made in December or January 2005 instead than November because he realized that Percel was not in United States in November 2005.

I want to clarify that the person who did me the favor of renting the car in which I arrested was Luz Alvarado which was my friend.  She lived in New York and I invited her to Houston, but she had no knowledge that I was doing illegal business.  I lied to her.  I am willing to pay for those mistakes that I made and testify in the court of the United States if they require to do me so.  (Document No. 498, p. 34-37).

In addition to Arias' affidavit, Vasquez submitted the affidavit of Bonifacio Hernandez.  This is

the same affidavit that Vasquez previously submitted to the Court in connection with his Motion

for New Trial.  In his affidavit, Hernandez states in part:

3.  Upon my arrest, I advised my attorney, David Adler, that individuals arrested in my case had no relationship to the charges and were no way involved with me in any crime.  I also advised my attorney that those individuals (Mr. Vasquez) had no knowledge of my criminal activities.

4.  I specifically advised Mr. Adler, my attorney, that neither co-defendants, Sugentino Percel nor Eric Vasquez, were involved in the crimes in which I was charged, nor did they have any knowledge of any drugs that were in my sole

possession.

5.  On more than one occasion I made a specific request that my attorney, Mr. Adler, fully inform the prosecutor that I was ready to testify for the defense of both co-defendants.  Specifically that I was aware that they had no knowledge nor were they participating in my criminal acts.

6.  Although my attorney never presented my information to the prosecutor on behalf of Mr. Percel and Mr. Vasquez, I understood that my attorney, Mr. Adler, did discuss my willingness to testify for the defense of Mr. Percel and Mr. Vasquez in the trial.

7.  Once again, I asked my attorney, Mr. Adler, to notify the attorneys for Mr. Percel and Mr. Vasquez that I was available and ready to testify on the behalf of their clients.

8.  Although I requested, on numerous occasions, that I be allow[ed] to testify to both Mr. Percel and Mr. Vasquez, unfortunately they are being punished and sentenced for crimes that they did not commit.  Neither did they have any personal knowledge of the crimes that they were charged with.

9.  It is through my sworn affidavit that I present to the Court, that if offered to testify at any hearing or at any subsequent trial, that I will provide direct testimony of my involvement, material to the charged offense, and I will provide exculpatory information relating to both Mr. Percel and Mr. Vasquez as to their non-involvement in the charged offense.  Both Mr. Percel and Mr. Vasquez are innocent of the charged crimes.  (Document No. 498, p. 40-42).

Finally, Vasquez submitted his own affidavit, in which he elaborated on his ineffective assistance

of counsel claims.  Vasquez's affidavit states in part:

2.  At no time during my pre-trial preparation, did my attorney ever explain to me the repercussions of the guidelines, the application of the guidelines relevant conduct, nor the application of the guidelines acceptance of responsibility sections.  In fact, I had very little conversations with my attorney at all regarding my pretrial preparations.  Had he taken a minimal amount of time to explain to me the repercussions of the guidelines, I would have never proceeded to trial.

3.  There was never any discussion that uncharged drug quantities would ever be applied to my sentence at any stage.  There was never any explanation of the acceptance of responsibility portions of the guidelines.

16

4.  Had counsel taken the opportunity to explain to me the guidelines in even the most basic term, I would have never proceeded to trial.  At all stages I was under my attorney's directions and advice.  Had counsel explained to me the acceptance of responsibility calculations of the guidelines, I would have never proceeded to trial and would have avoided a lengthy term of incarceration.

5.  I had never heard the application of the guidelines prior to my sentencing day.

6.  I was never explained the concept of "safety valve" and how it would have reduced my sentence considerably.  There was just no explanation of the guidelines even in the most basic fashion.

7.  During my pre-trial preparation, I advised my attorney to interview two of the Government witnesses to verify that their stories were being coerced.  I basically begged my attorney to interview Bonifacio and Arias since I was assured that they did not want to testify as they did and that they wanted to present the truth to counsel.

8.  I was assured by counsel that the Government's discovery was sufficient and that it was not required to interview [Bonifacio] and Arias.  Counsel was instructed to interview them on several occasions, however, he refused to do so as requested.

9.  Both witnesses had information that was useful to my defense in my case, but the information was not presented due to counsel's failure to prepare and call the witnesses.

10.  At all stages I relied on counsel's advise [sic] and was under the impression that counsel was preparing for my defense.

11.  Counsel even failed to meet with me at the jail prior to my trial to advise me on the status of the guidelines, nor advise me on the status of the interviews of the witnesses I requested on several occasions.

12.  It was not until my trial, that I realized that counsel had not done as I requested and interviewed the witnesses.  (Document No.  498, pp.  43-45).

The Government, in its Motion to Dismiss (Document No.  522), argues that Vasquez's §

2255 Motion to Vacate, Set Aside or Correct Sentence should be dismissed because Vasquez is

not entitled to relief.  According to the Government, Vasquez has not shown that his counsel was

deficient nor has he shown that he was prejudiced.

With respect to Vasquez's allegations of ineffective assistance of counsel, the

Government has submitted the affidavit of Vasquez's counsel, John Friesell, which had been

included in the record.  Mr.  Friesell states in pertinent part as follows:

> 2.  I was appointed to represent the defendant, Eric Vasquez, in *United States v.
> Eric Vasquez*, 4:06Cr089-5.  I represented Eric Vasquez at trial in this case.  After
> the trial, Vasquez retained new counsel who represented him during the
> sentencing phase.

> 3.  Vasquez told me before trial that Bonifacio Hernandez would testify on his
> behalf at trial and say that Vasquez was not involved with the offense.  Based on
> this information, I contacted Hernandez's attorney, David Adler, to determine if
> Hernandez had exculpatory testimony and should be subpoenaed to testify at trial.
> On November 7, 2006, Bonifacio Hernandez' attorney told me that Hernandez did
> not have any exculpatory evidence regarding Vasquez.  Because I was informed
> by his counsel that he did not have any exculpatory evidence as to Vasquez, I did
> not subpoena Bonifacio Hernandez as a defense witness for the trial.

> 4.  Vasquez never told me that Arias would testify on his behalf.  My notes of
> Arias' debriefing show that Arias debriefed on June 30, 2006 and informed agents
> that Vasquez was involved in the offense.  When I reviewed my notes of Arias'
> debriefing with Vasquez at the Federal Detention Center, Vasquez merely said
> that Arias was lying.  Furthermore, Arias had entered a plea agreement with the
> government and testified under that agreement at trial against Vasquez.

> 5.  Prior to trial I advised Vasquez in person at the Federal Detention Center about
> the application of the Guidelines to his case and the possibility of benefitting from
> the "safety valve" and the possibility of receiving a downward departure under
> USSG § 5K1.1.  Vasquez informed me he did not want to debrief for the safety
> valve or cooperate for a downward departure.  Mr.  Vasquez said that he wanted a
> trial.

> 6.  Because Vasquez wanted to proceed to trial I wrote a letter in Spanish that I
> sent to him by certified mail return receipt requested on November 10, 2006.  In
> this letter I explained how I believed the Guidelines would apply to his case if he
> were to go to trial; if he were to plead guilty and debrief to receive the benefit of
> the safety valve; and, if he were to plead guilty and agree to testify against others
> in the hopes of the government filing a motion for downward departure under
> USSG § 5K1.1. More specifically, in this letter I informed Vasquez that I

believed a jury would find him guilty if he proceeded to trial; that the base offense level would be 34 due to the amount of cocaine involved; that an increase of three levels could apply if he were found to be a leader; and, that an additional increase of two levels could be applied if he were held responsible for the firearms possessed by his codefendants.  I explained that this would result in a total offense level of 39 with an applicable range of punishment of 262-327 months imprisonment.  In this letter I also informed Vasquez that he could enter a guilty plea and debrief with the agents and receive the benefit of the safety valve without having to testify against anybody and that the prosecutor had informed me that if he were to do this the government would not seek a leadership enhancement or seek to hold him responsible for the firearms possessed by the codefendants.  I explained that this would most likely result in a total offense level of 30 with a corresponding guideline sentencing range of approximately 8 to 10.8 years.  Finally, I explained in this letter that Vasquez could possibly further reduce his sentence if he were to plead guilty and agree to testify against others involved in drug trafficking in the Boston area.  I informed Vasquez that this could result in a sentence fo approximately 5.5 years to 7.5 years.

7.  The jury convicted Vasquez on November 20, 2006.  I did not meet with Vasquez following the trial because Vasquez retained new counsel before his interview with U.S. Probation was scheduled.  The motion to substitute counsel was filed on December 15, 2006.  Because I did not met with Vasquez after his conviction, I did not review with him the continued possibility of receiving the benefit of the safety valve.  (Document No.  521, pp.  1-3).

Vasquez was provided a copy of counsel's affidavit, which was attached to the Government's Motion to Dismiss.  The docket sheet shows that Vasquez responded to the Government's motion and to the contents of the affidavit.  (Document No.  527).  This § 2255 proceeding is ripe for ruling.

## II. Discussion

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair

trial could not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective

reasonableness standard, with great deference given to counsel and a presumption that the

disputed conduct is reasonable.  *Id*. at 687-88.  The prejudice element requires a petitioner to

prove that absent the disputed conduct of counsel, the outcome would have been both different

and more favorable.  *Id*. at 694-95.  Under *Strickland*, a petitioner must establish both deficiency

and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient

performance or prejudice makes it unnecessary to examine the other prong.  *United States v.

Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is

"highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate

assistance and that the challenged conduct was the product of reasoned trial strategy."  *Wilkerson

v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing

*Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts

or omissions of counsel that are alleged not to have been the result of reasonable professional

judgment."  *Strickland*, 466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner

must be able to establish that absent his counsel's deficient performance, the result of his trial

could have been different.  "An error by counsel, even if professionally unreasonable, does not

warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

judgment." *Id*. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel.

The determination of whether counsel has rendered reasonably effective assistance turns on the

totality of facts in the entire record.  Each case is judged in light of the number, nature, and

seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)). Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v. Richter*, ___U.S.___, 131 S.Ct. 770, 778 (2011) recently discussed *Strickland* in the context of a state habeas proceeding. While *Harrington* did not involve a federal habeas proceeding, the Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and equally applies to claims brought in a federal habeas proceeding such as those raised herein by Vasquez.

With respect to ineffective assistance of counsel claims, the Court observed that "[t]here are, [ ] 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id.* at 788-89 (quoting from *Strickland*, 466 U.S. at 689). As a result, counsel's performance does not fall below that guaranteed by the Sixth Amendment where

21

it can be shown that counsel formulated a strategy that was reasonable at the time and balanced

limited resources with effective trial tactics and strategies. *Harrington*, 131 S.Ct. at 789. "Just

as there is no expectation that competent counsel will be a flawless strategist or tactician, an

attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to

prepare for what appear to be remote possibilities." *Harrington*, 131 S.Ct. at 791. Moreover, "it

is difficult to establish ineffective assistance when counsel's *overall* performance indicates active

and capable advocacy." *Harrington*, 131 S.Ct. at 791 (emphasis added). Finally, in considering

the prejudice prong of *Strickland*, the likelihood of a different result must be substantial, not just

conceivable. *Id.* at 791-792 (Citations omitted). As a result, "'[s]urmounting *Strickland's* high

bar is never an easy task.'" (quoting from *Padilla v. Kentucky*, 559 U.S. ___, ___, 130 S.Ct.

1473, 1485 (2010)). In part, because:

> Unlike a later reviewing court, the attorney observed the relevant proceedings,
> knew of materials outside the record, and interacted with the client, with opposing
> counsel, and with the judge. It is "all too tempting" to "second-guess counsel's
> assistance after conviction or adverse sentence." The question is whether an
> attorney's representation amounted to incompetence under "prevailing
> professional norms," not whether it deviated from best practices or most common
> custom.

*Harrington*, 131 S.Ct. at 778 (citations omitted).

As to the specific examples of ineffective assistance of counsel which Vasquez cites to in

support of this ineffectiveness claims, such as that counsel should have interviewed co-

defendants, failed to explain to him the effect of the Guidelines and how they would be used to

calculate his sentence, failed to advise him about U.S.S.G. § 2D1.1(b)(6) and § 5C1.2, which

could have reduced his sentence by two levels, and failed to object to improper jury instructions,

the record either affirmatively shows that Vasquez's counsel was not deficient or there is no

evidence that the alleged errors prejudiced Vasquez within the meaning of *Strickland*.

With respect to Vasquez's claim that his counsel failed to interview co-defendant Bonifacio Hernandez, his counsel does not dispute Vasquez's assertion that he told him about Bonifacio Hernandez's offer to testify that Vasquez was not involved in the offense.  Mr. Friessel counters in his affidavit that he did, indeed, confer with Bonifacio Hernandez's counsel, Mr.  David Adler, about his client's assertion that Hernandez had exculpatory evidence, and in the course of his conversation with Mr.  Adler, was apprised that Bonifacio Hernandez did not have any exculpatory evidence.  Given that Hernandez did not have any exculpatory evidence, Mr.  Friesell did not subpoena him for trial.  Upon this record, Vasquez has not shown that counsel's decision not to personally interview Hernandez fell below the *Strickland* standard in light of the representations of Mr.  David Adler, that his client had no exculpatory evidence regarding Vasquez's role in the offense.

As to Vasquez's claim that counsel failed to interview co-defendant, German Arias, Mr. Friesell states that Vasquez never suggested to him that German Arias was willing to testify on his behalf, and therefore he had no reason to interview him.  In addition, even assuming that Vasquez had told him that Arias has exculpatory evidence, his notes of Arias' June 30, 2006, debriefing, show that Arias informed agents that Vasquez was involved in the offense.  As a result, he had no basis to subpoena Arias since he had no exculpatory evidence.  In addition, there is no suggestion in the trial transcript that Arias had exculpatory evidence.  Arias' trial testimony was consistent with that of Mr.  Friesell's notes from the debriefing, namely he implicated Vasquez in the drug trafficking activities.  For example, he testified, in detail, about Vasquez's role in the drug trafficking activities.  Arias testified that he had known Vasquez for

23

seven years.  (Document No.  385, Transcript of Trial, p. 342).  He further described discussions

he had with Percel and Vasquez about coming to Houston in a van to buy drugs, and that once he

arrived in Houston, was in contact with both men.  He also testified that Vasquez helped wrap 35

bricks of cocaine by disguising it by using grease, mustard and menthols.  He also testified that

Vasquez and Percel helped him dismantle a van, in which 10 bricks of cocaine were hidden.  (*Id*.

at pp. 343, 347, 349, 350, 351 ).  This was not the only drug trafficking offense that Arias

testified about that involved Vasquez.   He testified about Vasquez's involvement in an earlier

drug trafficking, at which time Arias met with Percel and Vasquez at the apartment of co-

defendant Osorio.  Arias testified he picked up 10 kilograms of cocaine, which was loaded into a

van that driven to Boston, Massachusetts area.  (*Id*.  at pp. 357-360).  Arias testified that he

accepted responsibility for his actions and was testifying truthfully pursuant to his Plea

Agreement with the Government.  (*Id*.  at p. 364).  The record further shows that Vasquez's

counsel thoroughly cross examined Arias about his plea agreement and motivation for testifying

such as reducing his prison time to less than the ten year mandatory minimum, and possibility

that the Government could file a motion to reduce his sentence.  (*Id*.  at p. 379-388).  Upon this

record, Vasquez has not established that counsel was constitutionally ineffective for failing to

interview Arias.  Other than Vasquez's self serving affidavit and Arias' affidavit, submitted years

after he completed his prison sentence and received the benefit of his Plea Agreement, there is

nothing in the record to suggest that counsel could of and should have been aware of potentially

exculpatory evidence from Arias.   "An attorney need not pursue an investigation that would be

fruitless."  *Harrington*, 131 S.Ct.  at 789.  (citing to *Strickland*, 466 U.S. at 691).

      Next, Vasquez claims that his counsel was ineffective by failing to advise him as to the

effect of the Sentencing Guidelines and how the Guidelines would be used to calculate his sentence.  According to Vasquez, the failure by counsel to inform him about the Guidelines rendered his "plea involuntary."  In addition, he further alleges that counsel failed to inform him about the possibility of benefitting from the "safety valve" and receiving a downward departure under U.S.S.G. § 5K1.1. Even though Vasquez states that his plea was "involuntary," he does not affirmatively state that he advised his attorney of his desire to plead guilty.  Moreover, the record is absent of any indication by Vasquez at any stage of the proceedings of his desire to plead guilty.  As to Vasquez's contention that counsel failed to explain to him the guidelines and how they would apply to him should he proceed to trial, Mr.  Friesell in his affidavit describes, in detail, a conversation he had with Vasquez and a letter which memorialized this information, and which was translated into Spanish and sent to Vasquez, by certified mail.  The letter explained the Guidelines and distinguished the sentencing consequences under the guidelines between going to trial and pleading guilty.  Despite Vasquez's attempt to discredit the letter because it was not made part of the record, and suggesting that counsel is making it up, he does not, in his affidavit or in his response to the Government's Response, deny that the letter was sent.  Because counsel did inform Vasquez about the Guidelines, and how the guidelines are used to calculate a sentencing range and the sentencing advantages of pleading guilty in contrast to going to trial, Vasquez's ineffective assistance of counsel claims relating to the Guidelines fail.

Vasquez further alleges that his counsel was constitutionally ineffective in failing to object to the improper jury instructions that were read to the jury.  According to Vasquez, the jury instructions, as read, were improper because the Court left out a word.  Vasquez contends he was prejudiced by counsel's failure to object because the jury was allowed to draw an inference

on his fifth amendment right of silence.  Upon this record, Vasquez has not shown that counsel's performance fell below that of *Strickland*.  It is undisputed that the jury instruction that was read by Judge Harmon left out the word "not" but that the actual written instructions that were given to the jurors for their deliberations were correct.  The record further shows that Vasquez's appeal counsel raised this issue on appeal and the Fifth Circuit Court of Appeals found that Vasquez was not prejudiced by the Court's oral misstatement.  This Court, is not in a position, to revisit an issue that has been decided on appeal in a § 2255 motion.  *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir.  1986) ("It is well settled in this Circuit that issues raised and disposed of in a previous appeal from an original of conviction are not considered in § 2255 motion.").  Given that written instructions that were given to the jury were correct, Vasquez has not shown he was prejudiced by the Court's omission of a word when orally reading the jury instructions.  Any objection that could have and should have been made by counsel by the omission of "not" when the jury instructions were read aloud, were corrected a short while later when the jury retired to the jury room for deliberations with the written jury instructions.  This claim fails.

Finally, to the extent that Vasquez claims that he was prejudiced by the cumulative impact of trial counsel's errors and as a result he was denied due process, given that none of his allegations were meritorious, he cannot show the existence of cumulative errors.  Here, there has been no showing of ineffective assistance of counsel by Mr.  Friesell, in a situation such as here, where "counsel's overall performance indicates active and capable advocacy."  *Harrington*, 131 S.Ct.  at 791.  In sum, because Vasquez has not shown that counsel's performance amounted to incompetence under prevailing professional norms, all of his ineffective assistance of counsel claims fail under *Strickland*.

### III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss (Document No.  522) be GRANTED, and that Movant Eric Vasquez's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.  497) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the 14 day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 24th  day of February, 2011.

Frances H. Stacy
United States Magistrate Judge

27